O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANTE CARMEN MORRONE,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. SACV 16-01231-KES<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff Sante Carmen Morrone ("Plaintiff") appeals the final decision of the Administrative Law Judge ("ALJ") denying her application for Social Security Disability Insurance benefits ("DIB"). For the reasons discussed below, the ALJ's decision is AFFIRMED.

## I.
## BACKGROUND

Plaintiff applied for DIB on March 25, 2013, alleging the onset of disability on January 17, 2012. Administrative Record ("AR") 180-81, 46.[1] An ALJ

---

[1] Plaintiff's application states, "I became unable to work because of my disabling condition on October 6, 2008." AR 180. Plaintiff testified, however, that his disability onset date was January 17, 2012. AR 46. This is also the "date of
(Cont.)

1

conducted a hearing on September 15, 2014, at which Plaintiff, who was represented by an attorney, appeared and testified. AR 39-74.

On November 20, 2014, the ALJ issued a written decision denying Plaintiff's request for benefits. AR 18-32. The ALJ found that Plaintiff had the following severe impairments: "left shoulder labrum tear; left shoulder subacromial tendinopathy with impingement; right shoulder subacromial tendinopathy; and right shoulder acromioclavicular joint arthrosis." AR 23. Notwithstanding his impairments, the ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform the demands of sedentary work with the additional limits that he can lift/carry 10 pounds frequently and occasionally; can stand/walk "approximately 6 hours" per 8-hour workday; can sit "approximately 6 hours" per 8-hour workday "with normal breaks"; can frequently push/pull with the bilateral upper extremities; and can frequently reach overhead with the bilateral upper extremities. AR 25-26 (citing 20 C.F.R. § 404.1567(a)). Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform the work of assembler, document preparer, and film touchup inspector. AR 31-32. Therefore, the ALJ concluded that Plaintiff is not disabled. AR 32.

## II.
## ISSUES PRESENTED

<u>Issue No. 1</u>: Whether the ALJ properly evaluated the opinions of Plaintiff's "other" treating source, i.e., chiropractor Phu Q. La, D.C.; and

<u>Issue No. 2</u>: Whether the ALJ properly evaluated Plaintiff's testimony concerning his shoulder pain.

Joint Stipulation ("JS") at 4.

---

injury" identified in his workers' compensation benefit questionnaire. AR 182.

## III.

## DISCUSSION

**A.     The ALJ Properly Evaluated the Opinions of Chiropractor Phu La.**

**1. Applicable Law.**

Medical sources are divided into two categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1502, 404.1513. In general, only licensed physicians and similarly qualified specialists are "acceptable medical sources" who can provide evidence to establish a claimant's impairment. 20 C.F.R. § 404.1513(a). Chiropractors are included in the "other sources" category, and can provide evidence to show the severity of a claimant's impairment and how it affects his ability to work. 20 C.F.R. § 404.1513(d). Opinions from "other sources" can be afforded "less weight than opinions from acceptable medical sources." Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996). "The ALJ may discount testimony from … 'other sources' if the ALJ 'gives reasons germane to each witness for doing so.'" Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (quoting Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1224 (9th Cir. 2010)).

**2. Dr. La's Opinion and the ALJ's Reasons for Discounting It.**

Chiropractor Dr. La of One Stop Multi-Specialty Medical Group & Therapy treated Plaintiff since at least February 2013. AR 346.[2] In a letter dated January 22, 2014, Dr. La opined that Plaintiff was "not capable" of work requiring "heavy lifting more than 10 pounds and repetitive overhead reaching above and below shoulder levels." AR 758.

The ALJ gave "little weight" to Dr. La's opinion for two reasons. AR 27. First, she found them "overly restrictive and inconsistent with the record as a whole, including claimant's description of his activities." Id. Second, she

---

[2] This treatment record states that Plaintiff's date of injury was October 6, 2008.

3

1  determined that she should give greater weight to the conflicting opinions of
2  qualifying medical sources. Id.

3  **3. Analysis.**

4  The ALJ gave germane reasons for discounting the opinions of Dr. La
5  supported by evidence in the record. The ALJ considered the opinions of at least
6  four doctors who offered opinions on Plaintiff's reaching and lifting abilities: Drs.
7  Pan, Bayar, Hoang and Simpkins. AR 27-28. The ALJ gave "little" weight to the
8  opinions of Drs. Pan and Hoang because she determined that Plaintiff's medical
9  records supported "more restrictive functional limitations" than the limitations
10 suggested by those doctors. Dr. Hoang, for example, found Plaintiff could perform
11 medium-level work with no manipulative limitations for his upper extremities. AR
12 27, 371-76. The ALJ also considered Dr. Simpkins opinion that while Plaintiff had
13 a reduced range of shoulder motion, he is "unimpaired in his ability to work" and
14 "does not require any work restrictions." AR 325. The ALJ gave the most
15 "significant weight" to Dr. Bayar's reaching and lifting opinions, which were the
16 most restrictive of all four doctors, and she ultimately incorporated many of them
17 into her RFC determination. AR 25-26, 28. Given that all four of these doctors did
18 not assess restrictions on Plaintiff's lifting and carrying abilities as significant as
19 those assessed by Dr. La, this conflict was a germane reason supported by the
20 record to discount the opinions of Dr. La and give greater weight to those of a
21 qualified medical source.[3]

22 Plaintiff argues that while "Dr. Bayar and Dr. La are largely in agreement
23 with one another," they disagree concerning Plaintiff's ability to reach "below

---

[3] Plaintiff contends that the ALJ failed to identify with sufficient specificity the inconsistencies between Dr. La's opinion and the other medical evidence. JS at 8. The Court disagrees. Immediately after stating his reasons for discounting Dr. La's opinion, the ALJ discussed the opinions of Drs. Pan, Bayar, Hoang and Simpkins, showing how their opinions differed from those of Dr. La.

shoulder level." JS at 9-10. The ALJ correctly noted that Plaintiff's reported activities include many activities that would require reaching out below shoulder level, such as walking a dog, cleaning, watering plants, fishing, and yardwork. AR 25 (citing AR 336-38). Sub rosa video shows Plaintiff able to reach into the bed of his truck, reach to retrieve mail from a mail box, and reach to take items off a store shelf while shopping. AR 336. Thus, inconsistency with Plaintiff's activities was another germane reason for discounting Dr. La's restrictive opinion.

**B.     The ALJ Properly Evaluated Plaintiff's Pain Testimony.**

      **1.     Applicable Law.**

An ALJ's assessment of symptom severity and claimant credibility is entitled to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). "[T]he ALJ is not required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (internal quotation marks omitted).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. Lingerfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Id. at 1036. If so, the ALJ may not reject claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide

"clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834; Ghanim, 763 F.3d at 1163 & n.9. The ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8. "Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).

The ALJ may also use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for lying and inconsistencies in his statements or between his statements and his conduct. Smolen, 80 F.3d at 1284; Thomas, 278 F.3d at 958-59.[4]

### 2. Plaintiff's Hearing Testimony.

Plaintiff testified that since his alleged onset date of January 17, 2012, he has experienced "constant pain in the left shoulder; lots of pain." AR 46. He last worked on January 16, 2012, but he was terminated for taking too much time off for medical appointments due to earlier injuries. AR 47. While he was still working on January 16, he had a "hard time" because "the lock sets were heavy" and he needed "to carry them …." AR 47-48. He also could not "concentrate" or "focus." AR 48. He had been placed on "light duty" prior to losing his job. AR

---

[4] The Social Security Administration ("SSA") recently published SSR 16-3p, 2016 SSR LEXIS 4, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims. SSR 16-3p eliminates use of the term "credibility" from SSA policy, as the SSA's regulations do not use this term, and clarifies that subjective symptom evaluation is not an examination of a claimant's character. Murphy v. Comm'r of Soc. Sec., 2016 U.S. Dist. LEXIS 65189, at *25-26 n.6 (E.D. Tenn. May 18, 2016). SSR 16-3p took effect on March 16, 2016, approximately one year after the ALJ issued his decision on March 6, 2015, and therefore is not applicable to the ALJ's decision in this case. Id.

68.

He explained that he initially injured his left shoulder on October 6, 2008, and he had surgery in 2009, but was still in pain after the surgery. AR 48-49. He saw a different doctor to manipulate his shoulder, but believes that doctor tore his labrum, causing him to have "lots more pains and different pains since." AR 49. His left shoulder pain comes and goes, but increases with activity. AR 50. He testified that "picking up dishes, putting stuff in the cupboards, [and] doing laundry" are all activities that aggravate his shoulder pain. AR 51. When asked how he was limited in his ability to lift and carry things, Plaintiff said, "I can't do it," and that even a "cup of coffee will do it [i.e., cause pain]." Id. He was "not sure" of the heaviest item that he could lift comfortably with his left arm. AR 52. Even with his right arm, he could not lift more than 10 pounds. AR 53.

He testified that on a "regular day" he will "sit around the house, watch TV." AR 56. He will "take [his] dog for a walk sometimes if [he] can. Just pretty much stay home." Id. Each day, he spends "a couple of hours" laying down. AR 57. He testified that he is unable to wash dishes and has difficulty bathing, dressing himself, opening jars, and "carrying light bags from my car to the house." AR 60. He rated his shoulder pain as a 7 or 7.5 out of 10. AR 63. When he takes Naprosyn, which he does daily, the pain goes down to 6. AR 57, 63.

He used to play puzzles like Sudoku, but has stopped "since the last three or four months" (i.e., mid 2014) because he "can't concentrate anymore." AR 66. He still "goes bass fishing about once a month." AR 66-67. In order to go bass fishing, he does not use a "fly rod;" "you just toss out a line." AR 67.

**3.     The ALJ's Treatment of Plaintiff's Credibility.**

a.     Treatment History.

The ALJ found that "one factor affecting the claimant's credibility is his treatment history." AR 29. The ALJ then summarized the relevant treatment history as follows:

> Although claimant has received treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the claimant's favor, the record reveals the treatment has been generally successful in controlling those symptoms. The claimant did undergo surgery on his left shoulder in 2009 and was able to return to work. He was diagnosed with left shoulder labral tear in April 2014, but he did not follow his doctor's recommendation and declined the medication recommended. (Ex. 23F).

Id.

The cited exhibit is a 2-page April 2014 "progress note/work status" from Dr. Cortes. AR 759-60. This record is from Plaintiff's first and only appointment with Dr. Cortes prior to the hearing in September 2014. AR 43. As of the hearing date, Plaintiff reported that his doctors were doing "nothing" to address his pain because of "issues with the worker's compensation claim." AR 54. He explained the gaps in his treatment as follows: "I couldn't afford the gas to go down to L.A. anymore. I've been trying to get me to a different doctor, more closer, which was Dr. Cortes. And I never got the proper treatment from Dr. Cortes, because all the paperwork would get sent to her." AR 61.

Dr. Cortes diagnosed Plaintiff with a left shoulder labral tear[5] and "HX [history] of adhesive capsulitis."[6] AR 760. Dr. Cortes's treatment

---

[5] "The labrum is a piece of fibrocartilage (rubbery tissue) attached to the rim of the shoulder socket that helps keep the ball of the joint in place. When this cartilage is torn, it is called a labral tear." See http://www.hopkinsmedicine.org/orthopaedic-surgery/specialty-areas/sports-medicine/conditions-we-treat/labral-tear-shoulder.html.

[6] "Frozen shoulder, also known as adhesive capsulitis, is a condition characterized by stiffness and pain in your shoulder joint. Signs and symptoms typically begin gradually, worsen over time and then resolve, usually within one to three years. Your risk of developing frozen shoulder increases if you're recovering (Cont.)

recommendation says:

> Discussed greater risk of adhesive capsulitis if surgery is considered. Surgery would be scope with biceps tenodesis.[7] PT does not want to consider surgery. Rx Naproxen 500 MG … Declines Rx for Ultracet.[8] I do not prescribe narcotics beyond the initial postop period. Shoulder ROM [range of motion] exercises. FU [follow up] PRN [as needed] under future medical.

AR 759.

In response to the ALJ citing his refusal to consider surgery as a reason to discredit his testimony concerning the severity of his pain, Plaintiff asserts that his "refusal is clearly justified because of the greater risk that he would develop an increase in the severity of his condition." JS at 26. Plaintiff characterizes "adhesive capsulitis" as "the condition that has caused [him] to be disabled in the first place." JS at 35. Plaintiff also says that Dr. Cortes did not actually offer to prescribe him Ultracet, but instead "predicated the prescription for Ultracet on [his]

---

from a medical condition or procedure that prevents you from moving your arm …. Treatment for frozen shoulder involves range-of-motion exercises …." See http://www.mayoclinic.org/diseases-conditions/frozen-shoulder/basics/ definition/ con-20022510.

[7] "During a biceps tenodesis procedure the surgeon cuts the attachment of the biceps tendon to the labrum and then reattaches it to the humerus bone." See https://www.rothmaninstitute.com/specialties/treatments/biceps-tenodesis; See also http://www.njorthoclinic.com/need-biceps-tenodesis-labrum-tear/ [article and diagram].

[8] "Ultracet contains a combination of tramadol and acetaminophen. Tramadol is a narcotic-like pain reliever. Acetaminophen is a less potent pain reliever that increases the effects of tramadol." See https://www.drugs.com/ultracet.html. "Tramadol is a non-narcotic medication even though the effects it produces are similar to narcotics." See http://www.tramadolfacts.com/is-tramadol-a-narcotic/.

decision to have surgery, which is justifiably refused." Id.

An "unexplained, or inadequately explained, failure to seek treatment" may be the basis for an adverse credibility finding unless one of a "number of good reasons for not doing so" applies. Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989) (citing 20 C.F.R. § 404.1507 which lists examples of "good reasons for not following treatment," including religious beliefs, risk of blindness, amputation, and repeating the "same surgery" after "unsuccessful results"). In Nichols v. Califano, 556 F.2d 931 (9th Cir. 1977), the fifty-three-year-old claimant refused to undergo a surgery to correct urinary incontinence where two previous surgeries to correct the problem were unsuccessful and his doctors disagreed about the procedures and risks involved. Id. at 932. The Ninth Circuit found his refusal to undergo further surgery justified, reasoning as follows:

> A claimant … need not submit to all treatment, no matter how painful, dangerous, or uncertain of success, merely because one physician believes that a remedy may be effective. … A patient may be acting reasonably in refusing surgery that is painful or dangerous. … As the physician's prognosis becomes less optimistic, a claimant's refusal to undergo surgery may be more reasonable.

Id. at 933.

Plaintiff's situation is unlike the claimant's in Nichols. Plaintiff has not provided any evidence that any doctors disagreed that surgery offered potential benefits. While Plaintiff had undergone shoulder surgery previously, that surgery was to address a 2008 injury, not a labral tear suffered later. In April 2012, Plaintiff would have been forty-six years old. AR 102. The proposed surgical biceps tenodesis procedure was intended to alleviate pain caused by the biceps tendon pulling on the torn labrum. Plaintiff does not contend that his prior surgery involved biceps tenodesis. While immobilizing his arm post-surgery would create a risk of temporary adhesive capsulitis, nothing in the record indicates that this would

have been permanent or more disabling than Plaintiff's labral tear. Plaintiff, therefore, has failed to present evidence that his decision to decline surgery was justified, such that the ALJ did not err in citing that decision as a reason to discount his paintestimony.

Plaintiff and the ALJ have interpreted Dr. Cortes's note about Ultracet differently. The ALJ apparently understood it to mean that Dr. Cortes offered to prescribe Ultracet, a non-narcotic pain reliever, but Plaintiff declined the prescription. Her note saying "I do not prescribe narcotics beyond the initial postop period" was intended to explain why she did not offer him a narcotics prescription instead after he declined Ultracet. Plaintiff, on the other hand, asserts that Ultracet is a "narcotic-like analgesic," such that Dr. Cortes's note was explaining that she would prescribe Ultracet if he chose surgery, but she never actually offered to prescribe it, because he declined surgery. JS at 26.

The ALJ's interpretation is more consistent with the wording of Dr. Cortes's note. She said, "Declines Rx for Ultracet" using the present tense, suggesting Plaintiff actually declined the prescription during their appointment. AR 759. Given that Ultracet is generally not classified as a "narcotic," her statement about not prescribing narcotics beyond post-operative situations seems to be intended as a contrast to her willingness to prescribe Plaintiff Ultracet even without surgery. Id. Thus, the ALJ's determination that Plaintiff declined the medication recommended is supported by Dr. Cortes's note, and the ALJ did not err in citing it as a reason to further discount Plaintiff' pain testimony.

    b. Inconsistent Statements – Prior Deposition.

The ALJ also found that Plaintiff "has made inconsistent statements regarding matters relevant to the issue of disability," and such discrepancies "diminish[] the persuasiveness of [his] subjective complaints and alleged functional limitations." AR 30. First, the ALJ contrasted Plaintiff's hearing testimony concerning a regular day with the activities reported in a January 23, 2012

11

deposition (i.e., just days after Plaintiff's alleged onset date). Id. The ALJ summarized the deposition testimony, as follows:

> [T]he claimant stated he could lift 25 pounds before he starts to have difficulty. He builds fishing rods as a hobby twice a month, he goes fishing about three times a month; he likes to do yard work, but does not do it as much as he used to; he sometimes experiences pain when doing yard work (Ex. 3F/24-25 [AR 337-38]).

Id.

The ALJ cited a medical record summarizing Plaintiff's deposition testimony with page citations. That record says:

> Page 121: He can lift 25 pounds before he starts to have difficulties.
> Page 122: He likes to do yard work, but does not do as much as he used to and it is restricted due to pain. He experiences pain sometimes pushing or pulling doing his yard work. Prior to his injury he used to play golf. He builds fishing rods as a hobby twice a month.
> Page 124: He goes fishing about three times a month. His shoulder hurts the same all the time whether he is fishing or not. His is right-handed and casts the pole with his right hand. He does reel with the left hand, so there is minimal movement with the left hand.

AR 338.

The ALJ correctly identified inconsistencies between this testimony given in on January 23, 2012, and Plaintiff's hearing testimony given on September 15, 2014. In 2012, Plaintiff could lift 25 pounds, whereas he could not lift a cup of coffee with his left arm without pain in 2014. Cf., AR 51-52 and AR 338. In 2012, he went fishing three times a month, whereas in 2014, he only went once a month. Cf., AR 66-67 and AR 338. These differences, however, may simply indicate a worsening of Plaintiff's condition over two years' time. Standing alone, they would not be "clear and convincing reasons" for discounting Plaintiff's pain

testimony.

        c.    Inconsistent Statements – Function Reports.

The ALJ compared Plaintiff's Adult Function Report (AR 257-65) with a third-party Function Report submitted by his brother on the same day (AR 249-56). AR 30. The ALJ found these two reports inconsistent, as follows:

> In a Function Report dated November 23, 2013, the claimant indicated he has problems with personal care; his brother feeds and gives water to his dog; and he has to read instructions several times. (Ex. 9E). However, in a third-party Function Report with the same date, the claimant's brother indicated the claimant has no problem with personal care; the claimant feeds and gives water to his dog; and the claimant follows instructions well. (Ex. 8E).

Id.

Regarding dog care, Plaintiff responded "yes," he takes care of his dog by taking it on walks. AR 258. He also indicated that his brother, Mark, with whom he lives, helps care for the dog, because Mark "will feed and water the dog."[9] Id. Mark's report says that Plaintiff "feeds and gives water to his dog," but that Mark gives the dog weekly baths. AR 250. When asked if anyone helped Plaintiff take care of his dog, Mark answered, "no." Id.

Regarding personal care, Mark checked "no problem." Id. Plaintiff, in contrast, indicated that he had reaching-related difficulties with dressing, bathing, grooming, and using the toilet. AR 258.

Regarding following instructions, Mark indicated that Plaintiff is "great" at following written instructions, but only "so/so" at following spoken instructions, because he "may forget a few things." AR 254. He also indicated that Plaintiff can

---

[9] The Court refers to Mark by his first name because he and Plaintiff have the same last name; no disrespect is intended.

handle a savings account and checkbook. AR 252. Finally, he indicated that Plaintiff's injuries affect his concentration and completing tasks, but not his memory, understanding, or following instructions. AR 254.

Plaintiff indicated that he is not able to use a savings account or checkbook. AR 260. He reported that to follow written instructions, he must "read it several times," and to follow spoken instructions, he must "ask if I forget." AR 262. He asserted that his condition affects his memory, concentration, completing tasks, understanding, and following instructions. Id.

The inconsistencies concerning who does what to care for Plaintiff's dog are not "clear and convincing" reasons to discount Plaintiff's credibility. Mark simultaneously indicated that no one helps Plaintiff care for the dog, while also stating that he helps by washing the dog. It is unclear, therefore, what Mark considered "helping" with dog care. Since Plaintiff and his dog live with Mark, it seems likely that while giving the dog food and water is primarily Plaintiff's job, Mark occasionally helps.

The other inconsistencies identified by the ALJ are more troubling. When asked if his condition impairs his ability to care for his hair, Plaintiff wrote, "can't reach above – discomfort." AR 258. Mark would be able to observe if Plaintiff cannot wash or comb his hair without assistance, but Mark indicated that Plaintiff had "no problem" in this area. AR 250. Similarly, since they live together, Mark would know if Plaintiff can handle his own money. Plaintiff indicated that he was not "able" to "handle a savings account" or "use a checkbook," whereas Mark reported that he could do these things. AR 252, 260. The ALJ may well have concluded that Plaintiff was exaggerating the effects of his condition on his mental abilities, since Plaintiff indicated that he has impaired memory, understanding, and ability to follow instructions, whereas his brother did not indicate impairments in any of those areas and said that Plaintiff could follow written instructions "great." AR 254, 262.

The inconsistencies identified by the ALJ concerning limitations affecting Plaintiff's personal care and mental abilities are supported by the record, and they provide a second clear and convincing reason for the ALJ to have found Plaintiff's testimony concerning the severity of his symptoms not fully credible.

## IV.
## CONCLUSION

Based on the foregoing, IT IS ORDERED THAT judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: March 8, 2017

_____
KAREN E. SCOTT
United States Magistrate Judge